UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HARRY BUMGARDNER,

     Plaintiff,

v.                                   Case No:  6:12-cv-00018-Orl-31-TBS

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

_____

## REPORT AND RECOMMENDATION[1]

Plaintiff brings this action pursuant to the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") under the Act.

I have reviewed the record, including the administrative law judge's ("ALJ") decision, the exhibits, the administrative record, and the pleadings and memoranda submitted by the parties.  For the reasons that follow, I respectfully recommend that the Commissioner's final decision in this case be **REVERSED** and **REMANDED** for further proceedings consistent with the findings in this report, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  Background

Plaintiff filed for DIB benefits on December 19, 2009. (Tr.163-64). He alleges disability beginning on August 10, 2009 due to spondylosis, emphysema, and depression. (Tr. 171).  This application was denied initially and on reconsideration. (Tr. 86-88, 93-94).

---

[1] Specific written objections to this report and recommendation may be filed in accordance with 28 U.S.C. § 636, and M.D. Fla. R. 6.02, within fourteen (14) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

On November 8, 2010, at Plaintiff's request, a hearing was held before an ALJ who issued a decision on November 24, 2010, finding that he was not disabled. (Tr. 20-36). On November 15, 2011, the Appeals Council denied Plaintiff's timely request for review. (Tr. 5-10). Plaintiff has exhausted his administrative remedies, and this case is now ripe for consideration under 42 U.S.C. §§ 405(g).

Plaintiff was 44 years old on the date of the ALJ's decision and possesses an associate's degree.  (Tr. 47-48, 163). His past relevant work includes stints as a cable installer, car rental salesman, car salesman, and sales associate. (Tr. 172, 173). Plaintiff's medical file includes treatment records from Drs. Sawin, Jager, Buhrmann, McBride, Hate', Marrero, and Le.

Paul Sawin, M.D. - Treating Neurosurgeon[2]

Dr. Sawin began treating Plaintiff on July 18, 2009. (Tr. 362). Plaintiff complained of left upper extremity radiculopathy, numbness, and weakness associated with neck pain and stiffness. It was noted that he had a cervical discectomy[3] and fusion in 1999. Plaintiff also stated that he had chronic low back pain in a belt-like distribution. His medical history was for depression. Upon examination, Dr. Sawin noted slight weakness of the left biceps and left triceps, hypesthesia[4] and hyperalgesia[5] involving the third and fourth digits of the left hand, and decreased deep tendon reflexes in the left biceps and triceps. Id. An MRI of the cervical spine showed an osteophytic[6] ridge that effaces the subarachnoid space, a broad-based disc protrusion/osteophytic spur complex at C6-7 that creates stenosis on the

---

[2] Dr. Sawin is a board certified neurosurgeon (www-aama-assn.org).

[3] The excision of a vertebral posterior arch, usually to remove a lesion or herniated disk. Taber's Cyclopedic Medical Dictionary, 19th Ed. ("Taber's"), p. 1140.

[4] An elevation of the threshold for touch stimulation; usually noted in comparison with normal areas on the patient's body. Orthopaedic Dictionary, Stanley Hoppenfeld, M.D., and Michael Zeide, M.D. J.B. Lippincott Company, 1994 ("OD"), p. 168.

[5] An increased sensitivity to pain (http://www.online-medical-dictionary.org/Hyperalgesic+Sensation.asp?q=Hyperalgesic+Sensation).

[6] A projection or outgrowth of bone. This usually refers to a bony spur in arthritic joints. OD, p. 291.

left greater than right, and likely impingement on both C7 nerve roots. (Tr. 362-363). Dr.

Sawin diagnosed inferior junctional segmental stenosis at C6-7 with left C7 radiculopathy.

(Tr. 363). He recommended an additional surgical procedure of the cervical spine and

recommended an MRI of the lumbar spine for further evaluation of the low back pain issue.

Id.

An MRI of the lumbar spine dated July 29, 2009 revealed multilevel spondylosis[7]

with multilevel central canal narrowing most severe at the level of L5-S1 superimposed on

congenital narrowing of the lumbosacral spine, mild to moderate right-sided neural

foraminal narrowing at L3-4 where the posterior disc osteophyte complex contacts the

exiting nerve root on the right side, moderate right-sided neural foraminal narrowing at L4-5

secondary to disc osteophyte complex that effaces the right lateral recess and contacts the

nerve root, and moderate right-sided neural foraminal narrowing secondary to disc

osteophyte complex effacing the right lateral recess and the exiting nerve root at L5-S1.

(Tr. 378-381).

On August 21, 2009, Plaintiff underwent an anterior cervical disc arthroplasty at C5

through C7 with implantation of prosthesis at those levels and discectomy with

decompression, performed by Dr. Sawin. (Tr. 365-367). On October 1, 2009, Plaintiff

reported that his neck pain was resolved following surgery, but he had a lot of concern

regarding his lower back pain with occasional right lower extremity pain extending down to

his foot. (Tr. 360). The doctor recommended a series of epidural steroid injections[8] of the

lumbar spine along with physical therapy. Id. On November 11, 2009, Plaintiff stated that

he had two episteroid injections without any relief and he wished to have surgical

---

[7] Degenerative disease of both the disc and the joints of the spine. Symptoms include pain and restriction of movement. Spondylosis produces a characteristic appearance on x-ray that includes narrowing of the disc space and foramina and the presence of osteophytes. OD, p. 370.

[8] A type of injection of a local anesthetic agent into the epidural space. OD, p. 109.

intervention.  (Tr. 359).  A CT discogram[9] of the lumbar spine dated November 23, 2009 showed full-thickness partial to full circumferential tears at L2-3, L3-4, L4-5, and L5-S1. (Tr. 368). A lumbar discogram revealed abnormal disc morphology at L2 through S1 with 8 out of 10 concordant pain at L2 through L5 and 7 out of 10 concordant pain at L5-S1. (Tr. 369).

On December 4, 2009, Dr. Sawin reviewed the discogram results and recommended against surgery because Plaintiff's pain could not be narrowed down to one or two discs. (Tr. 358). The doctor stated that a multilevel fusion was not good for pain control. Therefore, long-term pain management was recommended. Id. On January 21, 2010, Plaintiff complained of significant problems with his low back. (Tr. 430). He was observed to ambulate with an antalgic gait.[10]  The doctor felt a dorsal column stimulator was a reasonable option for pain. Id.

David Jager, M.D. - Treating Pain Management Specialist[11]

Plaintiff began treatment with Dr. Jager on October 13, 2009. (Tr. 1033). Plaintiff described lower back pain that occasionally radiated to the buttocks and lower extremities with associated weakness in the leg. His lumbar spine MRI was reviewed. Id. An examination revealed slightly decreased extension of the cervical spine, scattered wheezes on breathing, and pain with flexion and extension of the lumbar spine. (Tr. 1035). Dr. Jager diagnosed low back pain, multilevel degenerative lumbar spine disease, history of two cervical spine surgeries, hypertension, chronic obstructive pulmonary disease ("COPD"), and a history of depression. Id. The doctor recommended epidural steroid injections and physical therapy. (Tr. 1035-1036). The first epidural was performed that day in the office. (Tr. 1036).

_____

[9] Radiographic studies of disc configurations after injection of contrast material. OD, p. 93.

[10] A painful limp or shortening of the stance phase on the affected side by quick, soft steps to avoid weight bearing and to diminish pain. OD, p. 17.

[11] Dr. Jager is a board certified anesthesiologist with a specialty in pain medicine (www.ama-assn.org).

On October 21, 2009, Plaintiff stated that the epidural did not help his pain. (Tr. 1029). A second injection was performed. (Tr. 1029-1030). On November 4, 2009, Plaintiff reported that although his pain was better at the office visit that day he did not feel like the second epidural injection helped as he had an episode of severe pain over the weekend. (Tr. 422). An examination revealed pain with flexion and extension of the lumbar spine. Id. Plaintiff was observed to walk with a cane. (Tr. 422-423). He was "discharged home in excellent condition." (Tr. 423). Dr. Jager performed bilateral facet joint injections at L4-5 and L5-S1. (Tr. 423).

On December 21, 2009, Plaintiff complained of continued low back and buttocks pain. (Tr. 419). He reported requiring medication for his pain, which made him sleepy, but did not significantly diminish his pain. Id. He was observed to be very stiff and was in pain getting from a seated to standing position. (Tr. 420). Plaintiff had pain with motion of the lumbar spine and associated stiffness. Dr. Jager diagnosed low back pain and bilateral buttocks pain, multilevel degenerative disc disease, facet arthropathy, history of cervical spine surgery, hypertension, COPD, and depression. Plaintiff was prescribed Morphine. Id. On December 30, 2009, it was noted that Plaintiff had "not had long-term improvement in his pain to allow him to function normally," and that he would undergo placement of a spinal cord stimulator. (Tr. 416-417). The stimulator was placed by Dr. Jager on January 12, 2010. (Tr. 993-995).

On January 15, 2010, Plaintiff reported significant improvement in his pain with use of the stimulator. (Tr. 983). He was able to "stand longer and walk better. He did not have to use a cane." (Id.). Dr. Jager recommended removal of the trial stimulator and placement of a permanent stimulator. (Tr. 984). The treating pain specialist performed surgical placement of Plaintiff's permanent stimulator on February 4, 2010. (Tr. 974-977).[12]

---

[12] Dr. Jager had difficulty with a malfunctioning spinal cord stimulator electrode. (Tr.

On March 31, 2010, Dr. Jager noted that Plaintiff had "a permanent spinal cord stimulator placed by Dr. Grady McBride at the end of February 2010" and Plaintiff stated that the spinal cord stimulator was helping, but he had increased pain when he tried to do things. (Tr. 493). Dr. Jager observed that Plaintiff was not using a cane and remarked that he "fe[lt] confident that [Plaintiff] will be able to return to functional."  (Tr. 494 ).  An examination revealed shakiness in Plaintiff's right leg that was likely behavioral. (Tr. 494). Dr. Jager recommended physical therapy. Id. By the time of his next visit, on April 28, 2010, Plaintiff stated that his pain had increased to the point he could not sit or stand for long periods of time. (Tr. 490). His wife had requested a wheelchair for him, but Dr. Jager did not feel this was warranted. However, Plaintiff still required MS-IR16[13] for his pain. Id. An examination revealed some difficulty with flexion and extension of the hips, some tremors in the lower extremities with extension of the knees, and a short and shuffling gait. (Tr. 490-491).

Dr. Jager completed a Spinal Impairment Questionnaire dated November 4, 2010. (Tr. 1055-1061). He diagnosed low back pain with bilateral buttock and lower extremity pain, degenerative disc disease of the lumbar spine, and foraminal stenosis. (Tr. 1055). Clinical findings included limited motion in left cervical rotation and lumbar flexion, extension, and side-bending, tenderness of the cervical and lumbar areas, lumbar muscle spasms, occasional left upper extremity weakness and mild lumbar weakness with hip flexion, an abnormal gait, and multiple trigger points. (Tr. 1055-1056). Dr. Jager cited to MRI and discogram findings showing degenerative disc disease and concordant pain, which supported the diagnoses. (Tr. 1057).  Plaintiff's primary symptoms were low back pain with bilateral buttock and lower extremity pain, and weakness of the lower extremities. Id.

---

974-977).  Dr. Jager removed the electrode and noted that he would discuss with Plaintiff the possibility of replacing the electrode at a future date.  (Tr. 977).
[13] A type of morphine (www.drugs.com).

Dr. Jager opined that Plaintiff was able to sit for less than 1 hour total and stand/walk for less than 1 hour total in an 8-hour workday. (Tr. 1058). He also needed to get up and move around every 20 minutes when sitting and not sit again for 20 minutes. Id. Plaintiff could lift and carry 5 pounds, but never more. (Tr. 1058-1059). Dr. Jager reported that Plaintiff's pain and other symptoms frequently interfered with his attention and concentration. (Tr. 1059). His condition caused good days and bad days. (Tr. 1060). Dr. Jager estimated Plaintiff would be absent from work, on the average, more than three times a month due to his impairments or treatment. Id. The doctor opined that the symptoms and limitations detailed in the questionnaire applied since April 2009. (Tr. 1061). It was noted that Dr. Jager discussed the questions with Plaintiff and examined him at the time he completed the questionnaire. Id.

Louise Buhrmann, M.D. - Treating Psychiatrist[14]

Dr. Buhrmann began treating Plaintiff on April 8, 2002, after Plaintiff was released from the hospital for a suicide attempt. (Tr. 354). On June 4, 2009, Plaintiff complained of problems with his back pain. (Tr. 324). He reported being at work off and on due to his problems. He was prescribed Lamictal.[15]  On July 2, 2009, Dr. Buhrmann reported that Plaintiff sounded depressed.  She recommended switching from Lamictal to Abilify.[16]  Id. On July 30, 2009, Dr. Buhrmann increased Plaintiff's dose of Abilify because of no changes. (Tr. 323).

On September 23, 2009, Plaintiff complained of poor sleep and not doing much because he was recovering from cervical spine surgery and having a lot of low back pain. (Tr. 322). On October 20, 2009, Plaintiff reported ongoing pain and difficulties driving. Id. At a follow-up on November 13, 2009, Plaintiff stated that his pain was "wearing him

---

[14] Dr. Buhrmann is a board certified psychiatrist (www.ama-assn.org).
[15] Lamictal is used to prevent extreme mood swings in individuals with bipolar disorder (www.rxlist.com).
[16] Abilify is used for major depressive disorder (www.rxlist.com).

down." (Tr. 321).  He also reported poor sleep even on Trazodone.[17]  Id.  On February 2,

2010, Plaintiff reported continued problems with pain even after placement of his spinal

cord stimulator. (Tr. 505). He also complained of feelings of sadness, insomnia, poor

energy, poor concentration and memory, and feeling restless. A mental status examination

revealed fleeting eye contact, sad facial expressions, blunted affect, depressed mood, and

fair judgment. Id. No significant changes were noted on March 9, 2010. (Tr. 504).

At a follow-up on April 7, 2010, Plaintiff said he wished he could return to work, even

part-time, but he had a difficult time even sitting in the car due to his pain. (Tr. 503).  Dr.

Buhrmann's mental status examination revealed fleeting eye contact, a sad appearance,

blunted affect, and depressed mood. Id. On May 4, 2010, Plaintiff complained of excessive

sleeping, vivid disturbing dreams of death, poor concentration and memory, restless

thinking, and fatigue. (Tr. 502). A mental status examination revealed unchanged findings.

Id.

On June 2, 2010, Plaintiff reported suicidal thoughts because he did not want to live

with his pain any longer. (Tr. 916). He was advised to go to the hospital for a psychiatric

admission. Id.  Plaintiff was admitted to Central Florida Behavioral Health Center

("CFBHC") where he remained an inpatient through June 10, 2010 due to suicidal ideation.

(Tr. 739). The day after his June 11, 2010 discharge, he was admitted to a partial-

hospitalization program where he continued to receive intensive treatment through June

28, 2010. (Tr. 823-824). Plaintiff's final diagnoses were major depressive disorder,

recurrent, severe, chronic pain, and COPD. Id.  His highest GAF score in the past year was

50.[18] (Tr. 824).  He was prescribed Abilify, Paxil,[19] and Ambien.[20] Id.

---

[17] Trazodone is indicated for the treatment of depression (www.rxlist.com).

[18] A GAF score of 41-50 is indicative of serious symptoms or any serious impairment
in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF
score of 51-60 denotes moderate symptoms. Diagnostic and Statistical Manual of Mental
Disorders 4th Ed. Text Revision ("DSM"), p. 34.

On June 29, 2010, Dr. Buhrmann's mental status evaluation revealed fleeting eye contact, a sad facial expression, blunted affect, and fair judgment. (Tr. 915). On July 21, 2010, Plaintiff reported memory problems, restlessness, and repeating himself. (Tr. 914). No changes were found on mental status examination. Id. Follow-up visits with Dr. Buhrmann through August 23, 2010, noted no changes in Plaintiff's condition. (Tr. 912-913). In a letter dated September 9, 2010, Dr. Buhrmann noted that she had been treating Plaintiff for depression since 2002. (Tr. 901). She also noted that Plaintiff felt useless because of his physical limitations and had gradually become more isolated to the point he became suicidal. His medications were Paxil, Symmetrel,[21] and Abilify. Id.

Dr. Buhrmann completed a Psychiatric/Psychological Impairment Questionnaire dated September 9, 2010. (Tr. 902-909). She diagnosed major depression with a GAF score of 45. (Tr. 902). Clinical findings included sleep disturbance, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, psychomotor retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, history of suicidal ideation or attempts, social withdrawal or isolation, decreased energy, persistent irrational fears, and severe pain at times. (Tr. 903). Plaintiff's primary symptoms were sadness, low energy, poor concentration, isolation, and chronic pain. (Tr. 904). Dr. Buhrmann opined that Plaintiff was markedly limited (defined as effectively precluded) in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance and in his ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 905-906). Plaintiff was moderately

---

[19] Paxil is indicated for major depressive disorder, panic disorder, and social anxiety disorder (www.rxlist.com).
[20] Ambien is a sedative used to treat sleeping problems (www.rxlist.com).
[21] Symmetrel is indicated for the treatment of Parkinson's disease and similar symptoms (www.rxlist.com).

limited (defined as significantly limited but not totally precluded) in his ability to carry out simple one or two-step instructions and in his ability to maintain attention and concentration for extended periods. (Tr. 905). He also experienced episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from and/or experience an increase in signs and symptoms as evidenced by increased depression with stress and pain (Tr. 907). It was noted that depression worsened his pain. (Tr. 908). He experienced good days and bad days. Id. Dr. Buhrmann opined that Plaintiff would be absent from work, on the average, more than three times a month. (Tr. 909).

Family Medical Center East

On May 13, 2009, Plaintiff complained of lower back pain that was worse with prolonged sitting or leaning when standing. (Tr. 605). An examination revealed spasms and tenderness over the SI joints bilaterally. (Tr. 606). The attending doctor diagnosed lower back pain and prescribed Lortab.[22] Id. On June 9, 2009, Plaintiff reported continued low back pain and stiffness. (Tr. 610). Physical therapy was recommended. (Tr. 611).

On May 8, 2010, it was noted that Plaintiff had been unable to exercise due to ongoing problems with his back pain. (Tr. 618-619). He expressed similar complaints at the next visit, on August 10, 2010. (Tr. 621-622). An examination revealed paraspinal muscle spasms and decreased lordosis of the lumbar spine. (Tr. 623). He was referred to pain management. (Tr. 624).

G. Grady McBride, M.D. - Treating Orthopedic Surgeon[23]

On February 16, 2010, Plaintiff was seen for complaints of low back pain and leg pain. (Tr. 693). He was observed to ambulate with a cane. (Tr. 694). An examination revealed difficulty raising on his heels and toes due to poor balance, pain with palpation of

---

[22] Lortab is indicated for the relief of moderate to moderately severe pain (www.rxlist.com).
[23] Dr. McBride is a board certified orthopedic surgeon (http://ww2.doh.state.fl.us/IRM00PRAES/PRASLIST.ASP).

the bilateral paraspinal muscles, and limited motion of the lumbar spine. (Tr. 694-695).  Dr.

McBride diagnosed chronic low back pain, degenerative disc disease, and radiculopathy.

(Tr. 696). The doctor recommended an MRI of the spine and consideration of a spinal cord

stimulator. Id. After placement of the stimulator, he was advised to follow-up with pain

management. (Tr. 700).

Nitin Hate', M.D. - SSA Consultative Examiner[24]

Dr. Hate' evaluated Plaintiff at the request of the Social Security Administration on

February 4, 2010. (Tr. 438). Plaintiff reported a history of two surgeries in his cervical

spine, COPD, and depression. Id. An examination revealed an antalgic gait, limited ability

to squat, and reduced motion in the thoracolumbar spine. (Tr. 438-439). Dr. Hate'

diagnosed history of COPD, status-post cervical fusion, and lumbar spine pain. (Tr. 439).

The doctor noted that although Plaintiff stated his lumbar spine was his primary problem at

the time, he was not provided with any treatment notes on the lumbar spine problems. Id.

Dr. Hate' opined that Plaintiff would have difficulty with lifting, stooping, and squatting, but

noted that records from the treating sources were required to make a more accurate

evaluation. (Tr. 440).

Kamir Marrero, Psy.D. - SSA Consultative Psychologist

Dr. Marrero evaluated Plaintiff at the request of the Commissioner on February 3,

2010. (Tr. 432). Plaintiff reported symptoms of a depressed mood, anhedonia,

hypersomnia, fatigue, feelings of hopelessness, and difficulty with concentration. He gave

a history of three suicide attempts. Id.  A mental status examination revealed a tense

posture and gait, sad affect, tired mood, slow and soft speech, distractible attention,

confusion at times, and variable concentration. (Tr. 433-434). Dr. Marrero diagnosed major

---

[24] Dr. Hate' is board certified in occupational medicine (www.ama-assn.org).

depressive disorder, recurrent, moderate, alcohol dependence, nicotine dependence, and cocaine abuse in full sustained remission. (Tr. 434).

Non–Examining State Agency Medical Consultants

Loc Le, M.D.,[25] completed a Physical Residual Functional Capacity Assessment on June 3, 2010. (Tr. 524-531). Dr. Le opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds and stand and/or walk 2 hours and sit 6 hours in an 8-hour workday. (Tr. 525). Plaintiff could also occasionally stoop, kneel, and crouch. (Tr. 526). He needed to avoid exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 528). The doctor did not specify what records he reviewed, but said Plaintiff's cervical pain resolved with surgery and his lumbar spine pain was not more limiting than found. (Tr. 529).

Pamela Green, Ph.D., completed a Psychiatric Review Technique form on March 10, 2010, wherein she diagnosed major depressive disorder and polysubstance abuse in remission. (Tr. 449, 454). Dr. Green opined Plaintiff was moderately limited in maintaining concentration, persistence, or pace, and mildly limited in activities of daily living and social functioning. (Tr. 456). She reported that Plaintiff had moderate limitations in his ability to understand, remember, and carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, in his ability to respond appropriately to changes in the work setting. (Tr. 460-461).  Eric Weiner, Ph.D., reviewed Plaintiff's file on June 16, 2010, and opined that Plaintiff had moderate limitations in activities of daily living; his ability to maintain social functioning; and, in his ability to maintain concentration, persistence, or pace. (Tr. 542).

---

[25] Dr. Le is a general practitioner (www.ama-assn.org).

Relevant Testimony of the Vocational Expert

The vocational expert ("VE"), Dana Lessne, testified that an individual of Plaintiff's age, education, and work history who is limited to light exertional work except that he could only stand or walk up to 2 hours in an 8-hour workday, occasionally climb no more than several steps with use of a handrail, no climbing ladders, ropes, or scaffolds, no working at heights, limited to simple tasks that can be learned on the job in 30 days, limited to tasks that are routine and repetitive, and no more than occasional interaction with others that is brief and superficial, could not perform any of Plaintiff's past relevant work. (Tr. 72-73). But, the VE testified he could perform other work as a ticket seller and parking lot attendant. (Tr. 73, 76-77). The VE stated that an individual who is off task more than 5 minutes every hour would be unable to perform any work. (Tr. 75-76). The VE testified that an individual who misses work more than three times a month could not perform any work. (Tr. 79-80).

After consideration of the medical evidence, and Plaintiff's testimony, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, COPD, depression, and a history of substance abuse. (Tr. 22).

The ALJ then found that, with his impairments, Plaintiff had the residual functional capacity to perform less than a full range of light work. (Tr. 26).  Specifically, the ALJ found Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 2 hours in an 8-hour day; sit for 6 hours; occasionally climb stairs, but no more than several steps that have a railing to hold onto; not climb ladders, ropes or scaffolds; and not be exposed to heights. (Tr. 26). Non-exertionally, the ALJ found Plaintiff could perform simple tasks that could be learned via on-the-job demonstration or within 30 days; routine tasks that are performed in the same or similar way each time; and repetitive tasks that are performed from start to finish throughout the work-shift. (Tr. 26).

The ALJ also found Plaintiff's interaction with others should be no more than occasional, and only enough to perform job-related tasks; otherwise Plaintiff could have only brief, superficial contact with third parties. (Tr. 26). The ALJ relied on testimony from the VE to conclude that other jobs existed in significant numbers which Plaintiff could perform. (Tr. 35).  Examples of such jobs are: ticket seller (395,311 available nationally, 25,598 in Florida), and parking lot attendant (69,630 nationally, 6,589 regionally). (Tr. 35, 73). The ALJ therefore found Plaintiff was not disabled pursuant to 20 C.F.R. § 404.1520(g). (Tr. 35).

Plaintiff requested review of the ALJ's decision by the Appeals Council on December 20, 2010. (Tr. 15). On November 15, 2011, the Appeals Council denied the request for review (Tr. 5-10), making the ALJ's decision the final decision of the Commissioner.  Plaintiff timely filed this action for judicial review on January 5, 2012. (Doc. 1).  Plaintiff has exhausted his available administrative remedies, and this case is properly before this Court.  On appeal, Plaintiff argues that (1) the ALJ failed to properly credit the testimony of his treating physicians, Dr. Jager and Dr. Buhrmann; (2) the ALJ failed to properly evaluate his credibility; and (3) the ALJ relied upon flawed VE testimony in reaching her decision.  (Doc. 13 at 21, 23).

## II. The ALJ's Decision

When determining whether an individual is disabled, the ALJ must follow the five-step sequential evaluation process established by the Commissioner and set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  Specifically, the ALJ must determine whether the claimant (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy.  See Phillips v. Barnhart, 357 F.3d

1232, 1237-1240 (11th Cir. 2004).  The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Phillips, 357 F.3d at 1241 n.10.

Here, the ALJ performed the required five-step sequential analysis. (Tr. 22-25).  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since August 10, 2009.  (Tr. 22). At step two, she determined that Plaintiff had the following severe impairments: degenerative disc disease (DDD) of the lumbar spine; COPD; depression; and a history of substance use disorder. Id.  At step three, the ALJ decided Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926.  (Tr. 24). At step four, she ALJ ruled that Plaintiff could not perform any past relevant work.  (Tr. 34).  Then, at step five, the ALJ concluded that there were other jobs that existed in significant number in the national economy that Plaintiff could perform.  Id. Accordingly, the ALJ found Plaintiff had not been under a disability within the meaning of the Act from August 10, 2009 through November 24, 2010, the date of the ALJ's decision. (Tr. 35).

### III. Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla but less than a preponderance.  It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).

When the Commissioner's decision is supported by substantial evidence the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  The district court "may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]"  Id.  "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision."  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

## IV.   Discussion

### A.  Treating Physicians' Opinions

Plaintiff argues that the ALJ failed to properly credit the testimony of his treating physicians, Dr. Jager and Dr. Buhrmann and improperly gave great weight to the opinion of non-examining state medical consultant Dr. Le.  (Doc. 13).  Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of steps four and five of the sequential evaluation process. The Eleventh Circuit recently clarified the standard the Commissioner is required to utilize when considering medical opinion evidence. In Winschel, the Eleventh Circuit held that whenever a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefor. 631 F.3d at 1178-79 (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)); see also Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987).

Absent good cause, the opinions of treating physicians must be accorded substantial or considerable weight. Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988). Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory[26] or inconsistent with the doctor's own medical records." Phillips, 357 F.3d at 1240-41 (citations omitted); see also Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir.1991).

When a treating physician's opinion does not warrant controlling weight, the ALJ must still consider the following factors in deciding how much weight to give the medical opinion: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; (6) other factors which tend to support or contradict the opinion." Logreco v. Astrue, No. 5:07-cv-80-Oc-10GRJ, 2008 WL 783593, at *10 (M.D. Fla. Mar. 20, 2008). "[T]he Commissioner 'must specify what weight is given to a treating physician's opinion and any reason for giving it no weight." Hill v. Barnhart, 440 F. Supp 2d 1269, 1273 (N.D. Ala. 2006) (citation omitted).

"The opinion of a non-examining physician does not establish the good cause necessary to reject the opinion of a treating physician." Johnson v. Barnhart, 138 F. App'x. 266, 270 (11th Cir. 2005); Bruet v. Barnhart, 313 F. Supp 2d 1338, 1346 (M.D. Fla. 2004) (the "good cause required before the treating physicians' opinions may be accorded little weight is not provided by the report of a non-examining physician where it contradicts the

---

[26] Where a treating physician has simply made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

report of the treating physician").   Moreover, the opinions of a non-examining physician do

not constitute substantial evidence when standing alone.  Spencer ex rel. Spencer v.

Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985).

### i.  Dr. Jager

The ALJ determined that Plaintiff could "lift or carry 20 pounds occasionally and 10

pounds frequently, stand or walk for 2 hours in an 8-hour workday, and sit for 6 hours in an

8-hour work day." (Tr. 26).  In November 2010, Plaintiff's treating physician (for pain

management), Dr. Jager, completed a medical source statement in which he indicated that

Plaintiff was "unable to perform even sedentary work, and that he could lift or carry only 5

pounds frequently, as well as sit, stand, or walk for only less than 1 hour in an 8-hour

workday." (Tr. 31).

The ALJ declined to give Dr. Jager's medical source statement controlling weight for

three reasons.  First, the ALJ said it constituted an opinion on an issue reserved to the

Commissioner (namely whether Plaintiff is "disabled" or "unable to work"); second, it was

completed with the help of Plaintiff; and, third, it was inconsistent with the physician's

treatment records and the record as a whole.  (Id.).

### (1)  Reason 1: An Opinion Reserved to the Commissioner

The ALJ determined that Dr. Jager's November 2010 medical source statement

would not be "accorded controlling weight because opinions on the issues of whether the

claimant is 'disabled' or 'unable to work' are reserved to the Commissioner because they

are administrative findings that are dispositive of a case[.]" (Id.).  A review of the record

demonstrates that Dr. Jager did not baldly assert that Plaintiff was disabled or that he was

unable to work.  Rather, Dr. Jager offered an assessment of what activity Plaintiff could still

do despite his impairments if "placed in a normal competitive five day a week work

environment on a sustained basis." (Tr. 1058).  This assessment is within the bounds of a

permissible treatment opinion.  See 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, **what [a claimant] can still do despite impairment(s)**, and [a claimant's] physical or mental restrictions.") (emphasis added); Krauser v. Astrue, 638 F.3d 1324, 1332 (10th Cir. 2011) ("[M]edical findings as to work-related limitations would, if accepted, impact the ALJ's determination of RFC . . . but that does not make the medical findings an impermissible opinion on RFC itself.  If doctors could only give opinions on matters that could not affect RFC, medical opinions would be inherently useless in disability determinations."). The Commissioner concedes that Dr. Jager did not use the words "disabled" or "unable to work," and offers no legal authority in support of his argument that Dr. Jager's assessment included "limitations so extreme that they can only be read as intended to preclude work." (Doc. 18 at 6).  Accordingly, I recommend the district court reject the ALJ's first reason for denying Dr. Jager's opinion controlling weight.

*(2)  Reason 2: Assessment was Completed with Plaintiff's Help*

The ALJ failed to give Dr. Jager's November 2010 medical source statement controlling weight because it "was completed with the help of the claimant."  (Tr. 31).  Again, the Commissioner fails to offer any legal support for the ALJ's conclusion and says in its memorandum that: "The fact that Dr. Jager indicated that he completed the assessment with the aid of Plaintiff and his wife suggests that Dr. Jager relied on Plaintiff's self-report of his limitations, and undermines the validity of the assessment . . ." (Doc. 18 at 9).

The fact that a treating physician's treatment notes and opinions incorporate a claimant's subjective complaints is not, by itself, a legitimate basis for discrediting the treating physician's opinion.  See Brand v. Sec. Dep't. Health Educ. and Welfare, 623 F.2d

523, 526 (8th Cir. 1980) ("Any medical diagnosis must necessarily rely upon the patient's history and subjective complaints."); see also Jones v. Barnhart, 318 F. Supp. 2d 1102, 1106 (N.D. Ala. 2004) ("As to the ALJ's assertion that Dr. Hillman's assessment is based on plaintiff's subjective complaints of pain, even were there not visible objective signs, not all diseases are diagnosed objectively.  In discussing subjective pain, our circuit has said the following: The Fifth and Eleventh Circuits have emphatically rejected the notion that to be disabling subjective claims of pain must be supported by objective medical evidence or by clinical or laboratory findings."); Matthews v. Barnhart, 347 F. Supp. 2d 1093, 1101 (M.D. Ala. 2003) (Regarding an "ALJ's rejection of a behavioral science doctor's opinion because it was based, in part, on a claimant's subjective complaints: This remarkable conclusion is made possible only by the ALJ's tacit equation of the [psychologist's] findings with plaintiff's subjective complaints, as if the former merely parroted the latter without any medical judgment/assessment intervening. This unstated assumption is unwarranted as a professional medical matter and unsupported by any unique facts specific to this case."). Accordingly, I respectfully recommend the district court reject the ALJ's second reason for denying Dr. Jager's opinion controlling weight.

(3)   *Reason 3: Medical Source Statement Conflicts with Treatment Records and Record as a Whole*

Dr. Jager's Treatment Records

The ALJ stated that Dr. Jager's November 2010 medical source statement was inconsistent with his own treatment notes and the record as a whole.  (Tr. 31). In support of her determination that Dr. Jager's own treatment notes conflicted with the medical source statement, the ALJ reasoned that in April 2010, the physician "noted that the claimant's request for a wheelchair was not warranted[.]" (Tr. 28).  Although this is an accurate recitation of a sentence in the medical opinion, it by no means presents a complete picture of Dr. Jager's observations and opinions recorded during the visit.  It is unclear whether the

ALJ considered Dr. Jager's April 2010 treatment notes in their entirety because the ALJ's decision omits medical observations and opinions that may be read to be consistent with the November 2010 medical source statement. For instance, during the April 2010 appointment, Dr. Jager noted that Plaintiff "continues to have pain" and that "[h]e continues to have difficulty walking and weakness in his legs." (Tr. 490). Dr. Jager said Plaintiff reported "his stimulator is stimulating well in his low back and buttocks and legs, but he states it does not seem to manage his pain." (Id.). Dr. Jager set forth a plan of action that included the possibility of referring Plaintiff to the "Mayo Clinic for a tertiary evaluation if he continues to have problems without any solutions." (Tr. 491). The ALJ failed to account for these medical opinions in her decision. This was Dr. Jager's last examination of Plaintiff prior to the November 2010 examination. On this record, there is no way of knowing whether the ALJ considered the remainder of the treatment notes and discredited them for some reason or whether she ignored them completely.

Dr. Jager's November 2010 assessment that Plaintiff remained limited in his functional capacity due to pain is consistent with his treatment notes, which reveal that Plaintiff's pain had not responded to limited medication therapy[27] and Plaintiff still experienced pain despite having the spinal stimulator. (Tr. 1055-61). Dr. Jager opined that Plaintiff's "symptoms are more than [he] would expect from his current structural changes in his low back," nevertheless, the doctor completed a medical source statement in which he indicated that Plaintiff was "unable to perform even sedentary work, and that he could lift or carry only 5 pounds frequently, as well as sit, stand, or walk for only less than 1 hour in an 8-hour workday." (Tr. 31, Tr. 1058-61). Dr. Jager's medical source statement was based on a diagnosis of low back pain with bilateral buttock and lower

---

[27] Plaintiff's medication therapy was limited by his history of addiction. In consideration of Plaintiff's history with drug abuse, Dr. Jager limited the amount of pain medication prescribed to Plaintiff at any one time. See (Tr.490).

extremity pain, degenerative disc disease of the lumbar spine, and foraminal stenosis and clinical findings of limited motion in left cervical rotation and lumbar flexion, extension, and side-bending, tenderness of the cervical and lumbar areas, lumbar muscle spasms, occasional left upper extremity weakness and mild lumbar weakness with hip flexion, an abnormal gait, and multiple trigger points.  (Tr. 1055-56).  Dr. Jager cited to MRI and discogram findings showing degenerative disc disease and concordant pain, which supported the diagnoses (Tr. 1057).  Therefore, Dr. Jager's medical source statement is based on substantial evidence, including Plaintiff's treatment history, clinical findings and objective laboratory and diagnostic test results.

The Record as a Whole

The ALJ concluded that Dr. Jager's November 2010 medical source statement conflicted with other medical opinions in Plaintiff's file.  (Tr. 31).  As proof, the ALJ cited to February 2010 medical source opinions from Dr. Hate', Dr. Marrero, and Dr. McBride. (Id.).

The ALJ noted that Dr. Hate'[28] found Plaintiff had normal motor strength, normal sensations, normal deep tendon reflexes, etc.  (Tr. 31).  However, the ALJ omitted significant portions of Dr. Hate's medical opinion from her decision, which raises the question of whether they were even considered.  For instance, Dr. Hate' found that Plaintiff's "[g]ait is antalgic due to pain in the back," his squatting capacity was restricted by 50%, and he had a "restricted range of motion and difficulty in toe walking," which is "consistent with discogenic pain."  (Tr. 439-441).  Based on his examination, Dr. Hate' concluded that Plaintiff "will have difficulty in activities that require lifting, repeated stooping, and squatting" and that his "[l]imitations would be related to pain."  (Tr. 441).

---

[28] Dr. Hate' examined Plaintiff at the request of the Commissioner.

Dr. Marrero's goal was to conduct a psychological assessment of Plaintiff, not a pain assessment.  Nevertheless, he observed that Plaintiff had tense posture, relied on the assistance of a cane and walked "extremely slow and with a limp." (Tr. 433).  The ALJ compared Dr. Marrero's report with Dr. McBride's February 2010 report in which he found that Plaintiff had "5/5 motor strength in his bilateral lower extremities," and his March 31, 2010 report in which he observed that Plaintiff was "doing quite well" with his dorsal column stimulator, and noted that he should only avoid heavy lifting and strenuous activities.  (Tr. 31, Tr. 871).  Despite observing that Plaintiff was "doing quite well" three weeks after his spinal column stimulator surgery, Dr. McBride recommended Plaintiff "continue under the care of Dr. Jager for continued pain management." (Tr. 869-871).  Dr. McBride's observations neither support nor contradict Dr. Jager's November 2010 assessment.  If anything, Dr. McBride's observations reveal Plaintiff's continued need for pain management.

The ALJ also determined that Dr. Jager's assessment was contradicted by the CFBHC's records.  The ALJ noted that "while an inpatient at CFBHC in June 2010, [Plaintiff] was able to engage in physical activities such as baseball and yoga." (Tr. 32).  I find that the ALJ has mischaracterized the CFBHC report.  The staff at CFBHC noted that Plaintiff suffered from "severe back problems," "was in a great deal of pain" and was hospitalized one night "until 3 am getting a Cortisone injection." (Tr. 763, 845).  The licensed mental health counselor opined that Plaintiff's "pain has exacerbated his depression . . ." (Tr. 845).  When viewed as a whole, the CFBHC medical records do not paint the picture of the baseball/yoga athlete the ALJ's findings imply.  The ALJ's report fails to address any of these treatment records from the CFBHC and the Court cannot tell whether the ALJ considered them.

Finally, the ALJ points to Dr. Hartman's August 2010 treatment notes as record evidence that contradicts Dr. Jager's assessment.  The ALJ states that "Dr. Hartman noted [in] the claimant's report that he was going to (be able to sit in an airplane for a period of time to) fly to New York to visit family.  (Tr. 32).  The ALJ completely ignores the portion of Dr. Hartman's treatment notes in which she recorded that Plaintiff continued to have "chronic Lumbar back pain" and that despite having a nerve stimulator in his back, he "request[ed] a referral to a new Pain management doctor for a second opinion."  (Tr. 891).

The ALJ instead afforded "great weight" to the opinion expressed by non-examining state agency physician, Dr. Le, that Plaintiff "could perform light work, and that he could lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk for 2 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday, with some postural and environmental limitations."  (Tr. 31-32).  Dr. Le, a general practitioner, never examined Plaintiff and based his assessment on an apparent review of unspecified medical records. The Commissioner argues that "[a]lthough Dr. Le did not review all of the evidence, the ALJ did, and the ALJ properly concluded that Dr. Le's opinion was supported by the medical evidence and consistent with the record as a whole."  (Doc. 18 at 11).  As I observed earlier, whether the ALJ actually reviewed all the record evidence is unclear because her opinion ignores significant portions of the medical records that are consistent with Dr. Jager's medical assessment.  For example, Dr. Le determined that Plaintiff's lower back pain "persists requiring multiple pain treatments modalities including narcotic meds, spinal stimulator w/o significant responses but there has not ben [sic] any neurological deficits with preserved motor, sensory functions . . ." (Tr. 529).  And, Dr. Le omitted any reference to the fact that Plaintiff's ability to be treated via medication management was severely limited due to his history of substance abuse.

The ALJ should have given little weight to Dr. Le's report to the extent it was inconsistent with Dr. Jager's medical source assessment.  See Mathis v. Astrue, Case No. 3:06-cv-816-J-MCR, 2008 WL 876955, at *14 (M.D. Fla. Mar. 27, 2008) (the opinion of reviewing non-examining physicians, when contrary to those of examining physicians, are entitled to little weight).  Thus, the ALJ improperly relied on Dr. Le's opinion to determine that Plaintiff could perform less than the full range of light work, with some additional limitations.  (Tr. 32).

Upon due consideration, I conclude that the ALJ's reasons for discounting Dr. Jager's opinion are not supported by substantial evidence and constitute reversible error. See Hill, 440 F. Supp. 2d at 1273 ("The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence.").[29]

### ii.  Dr. Buhrmann

Dr. Louise Buhrmann has been Plaintiff's treating psychiatrist since April 2002.  (Tr. 901).  On September 9, 2010, in a letter that accompanied the medical source statement, she wrote the following about Plaintiff:

> [H]e has had severe back problems with chronic pain.  The pain began to worsen at the beginning of this year.  He was hoping a surgical procedure would help but unfortunately, it did not.  He was unable to go to work because of the pain and felt useless. He also was dealing with problems with his mother's illness. He gradually became more isolated until at the point he became severely suicidal, he had to be hospitalized at Central Florida Behavioral Hospital in June 2010.  The hospitalization and subsequent day treatment was helpful.  However, he remains mildly to moderately depressed and his back still causes him a great deal of trouble so that sitting or standing for any long period of time is very uncomfortable.  I am continuing to treat him.

(Id.).  In her medical source opinion, Dr. Buhrmann also found Plaintiff had marked limitations in his ability to perform activities within a schedule; maintain regular attendance;

---

[29] The ALJ failed to specify the amount of weight she decided to give Dr. Jager's opinion.

to be punctual within customary tolerance; complete a normal workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 905-06).  Plaintiff had moderate limitations in his ability to carry out simple one or two-step instructions; carry out detailed instructions; and maintain attention and concentration for extended periods.  (Tr. 905).  Dr. Buhrmann noted that Plaintiff's "depression worsens his pain" and that he was likely to miss work more than three times in a month.  (Tr. 908-09). The ALJ declined to give Dr. Buhrmann's medical source statement and accompanying letter controlling weight for two reasons.  First, the ALJ said it constituted an opinion on an issue reserved to the Commissioner (namely whether Plaintiff is "disabled" or "unable to work"); second, the ALJ said it was inconsistent with the doctor's treatment records and the record as a whole.  (Tr. 32).

                    i.   *Reason 1: An Opinion Reserved to the Commissioner*

        The ALJ failed to give these opinions controlling weight "because opinions on the issues of whether the claimant is 'disabled' or 'unable to work' are reserved to the Commissioner because they are administrative findings that are dispositive of a case[.]" (Tr. 32).  Dr. Buhrmann did not baldly assert that Plaintiff was disabled or unable to work. Rather, she offered an assessment of what activities Plaintiff could still do despite his impairments under normal working conditions.  As it was with Dr. Jager's medical source statement, Dr. Buhrmann's assessment is within the bounds of a permissible treatment opinion.  See 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, **what [a claimant] can still do despite impairment(s)**, and [a claimant's] physical or mental restrictions.") (emphasis added); Krauser, 638 F.3d at 1332 ("[M]edical findings

as to work-related limitations would, if accepted, impact the ALJ's determination of RFC . . . but that does not make the medical findings an impermissible opinion on RFC itself.  If doctors could only give opinions on matters that could not affect RFC, medical opinions would be inherently useless in disability determinations."). Accordingly, I recommend the district court reject the ALJ's first reason for failing to afford Dr. Buhrmann's opinion controlling weight.

ii.  *Reason 2: Medical Source Statement Conflicts with Treatment Records and Record as a Whole*

Dr. Buhrmann's Treatment Records

The Commissioner argues that Dr. Buhrmann's treatment records do not support such extreme limitations as exist in the September 2010 medical source statement.  (Doc. 18 at 13).  In her written decision, the ALJ noted that Dr. Buhrmann's medical assessments from April 2007 and August 2010 revealed Plaintiff was cooperative and attentive with normal mental capacities and decision making skills.  (Tr. 33).  However, I do not find Dr. Buhrmann's September 2010 opinions to be contradicted by the August (17th and 23rd) 2010 reports.[30]  In the August 2010 reports, Dr. Buhrmann observed that Plaintiff was attentive, his concentration appeared normal, his mood was neutral and his speech was normal.  (Tr. 912-13).  She noted that he did not have suicidal ideation, but that his employment was terminated.  (Tr. 912).  The September 2010 source statement accounts for this upswing in Plaintiff's mood by noting that his June 2010 "hospitalization and subsequent day treatment was helpful," but that "he remains mildly to moderately depressed and his back still causes him a great deal of trouble . . ." (Tr. 901).

---

[30] The value of the April 2007 report is limited because it does not take into consideration Plaintiff's condition immediately prior to, during, and/or after his hospitalization.

Dr. Green's and Dr. Wiener's Treatment Records

The ALJ afforded "great weight" to the opinions of non-examining state agency psychologists Green and Wiener. (Tr. 33). The ALJ maintains that these reports, generated in March and June 2010, respectively, "opined that the claimant was able to understand, carry out, and remember simple, basic, routing instructions, tasks, and work procedures; cooperate, be socially appropriate, and have brief interaction with others; and respond appropriately to a few changes in the work environment." (Id.). It is significant that both of these reports predate Plaintiff's hospitalization and neither is based on a direct examination of Plaintiff. (Tr. 462, 548).

It is unclear which medical records Drs. Green and Wiener examined and the date range of those records. Dr. Weiner's June 16, 2010 report was created during Plaintiff's hospitalization.[31] There is not substantial evidence in the record to determine whether Dr. Weiner actually examined Plaintiff in the hospital, or whether he relied on old records that did not take into account Plaintiff's hospitalization, which was taking place contemporaneously with the writing of his report. What is inexplicably absent from the ALJ's written decision is any discussion of the CFBHC treatment records which document Plaintiff's "severe back problems" and his major, severe, and recurrent depression with psychosis. (Tr. 763, 823). The CFBHC treatment records also document the fact that at least one physician observed that Plaintiff's psychosocial stressors were "work related." (Tr. 824).

The ALJ should have given little weight to the reports of Drs. Green and Wiener to the extent they were inconsistent with Dr. Buhrmann's medical source statement and treatment summary letter. See Mathis, 2008 WL 876955, at *14 (the opinion of reviewing

---

[31] Plaintiff was admitted and re-admitted to the CFBHC several times between June 2, 2010 and June 28, 2010. See (Tr. 739, 823).

non-examining physicians, when contrary to those of examining physicians, are entitled to little weight).

Upon due consideration, I recommend the district court find that the ALJ's reasons for discounting Dr. Buhrmann's opinion are not supported by substantial evidence and constitute reversible error.  See Hill, 440 F. Supp. 2d at 1273  ("The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence.").[32]

### B.  Plaintiff's Credibility and Vocational Expert Testimony

Plaintiff's remaining arguments focus on the ALJ's alleged error in failing to properly evaluate his credibility and her reliance on flawed vocational expert testimony in reaching her decision.  (Doc. 13 at 21-25).  Because remand is required on the other issues raised in the case, it is unnecessary to review Plaintiff's other objections to the ALJ's decision. Freese v. Astrue, No.8:06-cv-1839-T-EAJ, 2008 WL 1777722, at *3 (M.D. Fla. April 18, 2008) (citing Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1991)).

### V. Recommendation

Upon consideration of the foregoing, I respectfully recommend that:

1.  The Commissioner's final decision in this case be **REVERSED and REMANDED** for further proceedings consistent with the findings in this report.

2.  The Clerk be directed to enter judgment accordingly and **CLOSE** the file.

3.  Plaintiff be advised that the deadline to file a motion for attorney's fees pursuant to 42 U.S.C. § 406(b) shall be thirty (30) days after Plaintiff receives notice from the Social Security Administration of the amount of past due benefits awarded.

---

[32] The ALJ failed to specify the amount of weight she decided to give Dr. Buhrmann opinion.

4. Plaintiff be directed that upon receipt of such notice, he shall promptly email

Mr. Rudy and the OGC attorney who prepared the Government's brief to

advise that the notice has been received.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on January 30, 2013.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding United States District Judge
Counsel of Record
Any Unrepresented Parties